OPINION
{¶ 1} Cornelius R. Love has filed this action in mandamus, seeking a writ to compel the Industrial Commission of Ohio ("commission") to vacate its order denying him temporary total disability ("TTD") compensation and to compel the commission to enter a new order granting the compensation. *Page 2 
 {¶ 2} In accord with Loc. R. 12, the case was referred to a magistrate to conduct appropriate proceedings. The parties stipulated the pertinent evidence and filed briefs. The magistrate then issued a magistrate's decision which contains detailed findings of fact and conclusions of law which is appended to this memorandum decision. The magistrate's decision includes a recommendation that we grant a writ of mandamus to compel the commission to address the question of whether Love was fired by his former employer, The K D Group, Inc., based upon a pretext and therefore whether Love truly abandoned his former employment.
 {¶ 3} The K D Group has filed objections to the magistrate's decision. The case is now before the court for review.
 {¶ 4} Love was working as a maintenance man when he was injured on April 16, 2007. His employer's medical provider released him to return to work three days later. The next day, his treating physician took him off work for two weeks. The physician released him to return to work with medical restrictions on April 30, 2007 and Love returned to work.
 {¶ 5} Love continued to work until he went on vacation May 21, 2007 until May 24, 2007. He was scheduled for work on May 25, 2007, but did not report or call in on that day, apparently because he had car trouble while driving back from Alabama. He claimed he was unable to either report or call.
 {¶ 6} Love returned to work on May 28, 2007 and apparently worked a full day. He reported for work on May 29, 2007 and worked one-half day. At 1:00 p.m., he was informed that he was being fired for failing to report or call in on May 25 in violation of a written work rule. *Page 3 
 {¶ 7} On May 30, 2007, Love applied for TTD, as he had before returning to work. At the administrative hearings, his counsel argued that the firing was retaliation for his pursuing his rights under workers' compensation. The commission did not address the issue of pretext, despite counsel for Love arguing this issue in writing.
 {¶ 8} We do not have a transcript of the testimony presented to the commission before us, so we do not have an independent basis for determining what testimony was given. A written case management plan in the record supports the allegation that he was permitted to work for a day and one-half following his failure to call in a work absence. The case management plan also indicates that Love felt he was wrongly terminated.
 {¶ 9} In light of the fact that Love was permitted to work for a day and one-half after the event which supposedly was his voluntary abandonment of employment and in light of the fact that he was terminated in close proximity to the time he applied for TTD compensation, the commission should have addressed the issues of pretext.
 {¶ 10} We overrule the objection to the magistrate's decision, except we delete the factual allegations as to Love's contact with his supervisor and the duties Love performed after his return from vacation. We adopt the conclusions of law and remaining findings of fact in the magistrate's decision. As a result, we issue a writ of mandamus compelling the commission to vacate its prior order denying TTD compensation for Love and compelling the commission to conduct additional proceedings to determine if the firing was a pretext.
Objections overruled; writ of mandamus granted.
 FRENCH, P.J., and KLATT, J., concur. *Page 4 APPENDIX MAGISTRATE`S DECISION IN MANDAMUS {¶ 11} In this original action, relator, Cornelius R. Love, requests a writ of mandamus ordering respondent Industrial Commission of Ohio ("commission") to vacate its order denying him temporary total disability ("TTD") compensation on grounds *Page 5 
that he voluntarily abandoned his employment, and to enter an order granting said compensation.
Findings of Fact: {¶ 12} 1. On April 16, 2007, relator sustained an industrial injury while employed in the maintenance department of respondent The K D Group, Inc. ("K D" or "employer"), a state-fund employer. The employer owns and maintains residential apartments. On April 16, 2007, relator injured his left ankle and lower back when he fell down some steps.
 {¶ 13} 2. Initially, the industrial claim (No. 07-821711) was allowed for a left ankle sprain.
 {¶ 14} 3. Relator was initially treated for his injury by the employer's medical provider who released him to return to work on April 19, 2007. On that date, relator returned to work at his regular duty.
 {¶ 15} 4. On April 20, 2007, relator was initially examined by treating physician Juan M. Hernandez, M.D., who wrote:
 * * * He is in my office this morning and continues to complain of pain in his ankle, which leads to difficulty with walking. He continues to complain of pain in his low back.
 * * *
 Diagnoses: 1) severe sprain/strain — left ankle 2) contusion and sprain/strain — lumbar spine
 * * * I told him to continue wearing the air-cast and to continue keeping the left ankle elevated. I told him that he could either apply heat or ice now, depending on which made him more comfortable at this point. I gave him prescriptions for Vicodin ES and for naproxen. I told him to discontinue taking the ibuprofen. I asked him to schedule an appointment with our physical therapist for evaluation and I *Page 6 
will submit a C9 for the same. I took him off work for two weeks. I asked him to come back for an evaluation prior to returning to work in two weeks and he said he would do that.
 {¶ 16} 5. In a letter to relator dated April 20, 2007, the employer's director of human resources acknowledged receipt on that date of a "Physician's Report o[f] Work Ability" ("Medco-14") from Dr. Hernandez. The letter states:
 * * * I wanted to clarify that our handbook states that we can accommodate work restrictions and we can place you on light duty within your doctor's restrictions. We are more then [sic] willing to make any arrangements necessary as you recover (even a sitting job or a non-lifting job). We can accommodate any and all restrictions you may have in the future. This is a letter letting you know that there is a job available for you to return to work once you have restrictions. Please consider this a light duty job offer to you once you have restrictions.
 I will be in touch with you shortly should the status of this work ability report change in light of this reiteration of our light duty policy to you and your physician.
 {¶ 17} 6. On April 27, 2007, Dr. Hernandez completed a Medco-14 on which he certified that relator may return to work beginning April 30, 2007 with the following restrictions: "No overhead reaching; must be able to sit/stand/walk at will. No heavy lifting (35 lbs. and only occasionally)."
 {¶ 18} 7. On April 30, 2007, relator returned to work at K D at a light-duty position.
 {¶ 19} 8. On May 8, 2007, Dr. Hernandez completed a C-9 requesting authorization for physical therapy two times per week for eight weeks. On May 10, 2007, the employer's Managed Care Organization ("MCO") dismissed the C-9, *Page 7 
explaining: "C9 is dismissed without prejudice as the employer is part of the $5K Medical Only program."
 {¶ 20} 9. By letter dated May 15, 2007, relator's counsel informed the Ohio Bureau of Workers' Compensation ("bureau"):
 Please be advised that this employer is not able to participate in the 5k program. My client was held off work by Dr. Hernandez from Medical Care Group from 04/20/07 through 04/30/07. He will not be paid for the first seven days he was off, but certainly will be paid for the 8th[,] 9th and 10th days. As such, the employer cannot participate in the 5k program. My client's medical bills should be processed under the BWC and MCO guidelines.
 {¶ 21} 10. On May 16, 2007, relator returned to see Dr. Hernandez who wrote: "Mr. Love hobbles into the room with an antalgic gait favoring the left lower extremity. He tells me `my foot and ankle hurt when I walk.'"
 {¶ 22} 11. According to relator, he was on an approved vacation from May 21 through 24, 2007. On his return trip from the state of Alabama, he had car problems and thus did not call in to his employer that he would not be reporting to work on May 25, 2007 as scheduled.
 {¶ 23} 12. According to relator, he was scheduled to be off work on May 26 and 27, 2007.
 {¶ 24} 13. According to relator, he returned to work on Monday, May 28, 2007, which was a legal holiday (Memorial Day). Although he was supposed to be on light duty, he nevertheless returned as a maintenance man on call. He made six emergency calls to the apartment complex to which he was assigned. *Page 8 
 {¶ 25} 14. According to relator, he talked to his supervisor, Chris Lupica, six times on May 28, 2007, but was never told that he would be discharged.
 {¶ 26} 15. According to relator, he worked on May 29, 2007 from 8 a.m. to 1 p.m. At 1 p.m., he was discharged for failing to call in on May 25, 2007.
 {¶ 27} 16. The record contains a K D "Employee Discipline Report" form that appears to have been completed by supervisor and maintenance director Chris Lupica on May 29, 2007.
 {¶ 28} Under "Description of Violation," Lupica wrote: "On 5.25.07 Ray was a no call-no show to work. As per company policy this is a termination. After speaking with Ray on 5.29.07 he states he was out of town and his car broke down and there was no way to contact his employer."
 {¶ 29} Under the "Employee Signature" line, Lupica wrote: "refused to sign-wants to talk to attorney."
 {¶ 30} Under "Disciplinary actions," the form prompts the preparer to select by checkmark from the following four options: "First Warning (Verbal)," "Second Warning (1st written)," "Final Warning (2nd written)," and "Discharge."
 {¶ 31} By checkmark, Lupica selected "Discharge" for the disciplinary action to be taken.
 {¶ 32} 17. The record contains a page apparently taken from the K D employee handbook. It states:
 NO CALL/NO SHOW: Absence from one day of work without notice to the immediate supervisor is considered a "No Call / No Show" and is considered a self-termination.
 * * * *Page 9 
 CALLING OFF WORK: You must personally notify your immediate supervisor no later than one (1) hour after your scheduled shift starts. Failure to do so may result in disciplinary action up to and including termination.
 {¶ 33} Also, on May 29, 2007, the bureau mailed an order awarding TTD compensation. The bureau's order explains:
 The first seven days of disability, 04/20/2007, 04/21/2007, 04/22/2007, 04/23/2007, 04/24/2007, 04/25/2007, and 04/-26/2007, are not payable at this time. The injured worker has not been disabled for 14 or more consecutive days due to the allowed condition(s). These days may be paid if the injured worker becomes disabled for 14 or more consecutive days.
 BWC grants temporary total disability payments (TT) from 04/27/2007 to 04/29/2007.
 The injured worker was released to return to work on 04/30/2007.
 {¶ 34} 19. On May 30, 2007, the day after his discharge, relator was seen by Dr. Hernandez. On that date, on a Medco-14, Dr. Hernandez certified a period of total disability beginning May 30, 2007, to an estimated return-to-work date of July 9, 2007. The Medco-14 was filed on June 1, 2007.
 {¶ 35} 20. On May 31, 2007, Dr. Hernandez completed a C-84 certifying TTD beginning May 30, 2007 to an estimated return-to-work date of July 9, 2007.
 {¶ 36} 21. Following an August 22, 2007 hearing, a district hearing officer ("DHO") issued an order denying relator's request for TTD compensation. The DHO's order explains:
 It is the order of the District Hearing Officer that the MEDCO-14 Physician's Report Of Workability filed by Injured Worker on 06/01/2007 is denied. *Page 10 
 The District Hearing Officer orders that the injured worker's request to restart temporary total disability compensation in this claim is denied.
 The District Hearing Officer orders that temporary total disability compensation is specifically denied for the following requested period: 5/30/2007 through the present (8/22/2007).
 The District Hearing Officer finds that the injured worker failed to prove that he was rendered temporarily totally disabled due to the allowed left ankle sprain condition recognized in this 4/16/2007 work place injury claim for the above noted period.
 The District Hearing Officer finds that the injured worker was injured on 4/16/2007, was off work until 4/29/2007 and had returned to work for the period from 4/30/2007 forward. The injured worker was a no call/no show on 5/25/2007 and was terminated on 5/29/2007 pursuant to company policy clearly defined as a terminable offense in the employee handbook that the injured worker acknowledged receipt of on 2/2/2007.
 Pursuant to the [State ex rel. Louisiana-Pacific Corp. v. Indus. Comm. (1995), 72 Ohio St.3d 401] decision of the Ohio Supreme Court, the injured worker's voluntary abandonment of his employment by violating a known written work rule that he was made aware of as a terminable offense serves as a bar to his receipt of temporary total disability compensation. The District Hearing Officer notes that the injured worker had not returned to the workforce in any capacity since his 5/29/2007 termination with the instant employer.
 Based upon the foregoing, the District Hearing Officer orders that the injured worker's request to restart temporary total disability compensation in this claim is denied in its entirety.
 The District Hearing Officer has reviewed and considered all of the evidence contained in the claim file prior to rendering this decision.
 This order is based upon the injured worker's 2/2/2007 acknowledgement of receipt of the employee handbook from his employer, the employee handbook policy indicating a no *Page 11 
call/no show is considered a self-termination and a terminable offense, the 5/29/2007 termination materials on file, evidence contained in the claim file and evidence adduced at hearing, including the injured worker's testimony indicating that he did not call or show up for work on 5/25/2007.
 {¶ 37} The DHO's order indicates that relator appeared at the hearing with counsel. The employer appeared by counsel.
 {¶ 38} 22. Relator administratively appealed the DHO's order of August 22, 2007. In support of the appeal, relator's counsel submitted a three-page memorandum captioned "Claimant's Discharge for a Work Violation was a Pretext for Pursing [sic] a Workers' Compensation Claim."
 {¶ 39} In the memorandum, counsel asserts "facts" that were allegedly shown through relator's hearing testimony before the DHO. However, relator's hearing testimony was apparently not recorded and, thus, we do not have a transcript of the hearing testimony. Counsel's memorandum asserts the following "facts":
 4. Claimant testified that he was on approved vacation on 5/21, 5/22, 5/23 and 5/24 in the State of Alabama. Claimant testified that he had car problems on his return trip and did not call in for his scheduled work day on 5/25.
 5. Claimant was scheduled off work on 5/26 and 5/27.
 6. Claimant returned to work on 5/28, a legal holiday. He was supposed to be on light duty restrictions but he returned as a maintenance man on call.
 7. On 5/28, claimant made six emergency calls in the apartment complex he was assigned to.
 8. Claimant talked to his supervisor, Chris Lupica, six times on 5/28/07 and was never told he was discharged.
 9. Claimant worked on 5/29 from 8 AM to 1PM. At 1 PM, he was discharged for not calling in on 5/25/07. *Page 12 
 {¶ 40} Based upon the above-claimed "facts," counsel's memorandum to the SHO argues:
 Common sense tells one that the employer had no intention of firing claimant on Memorial Day, 5/28/07. The claimant's supervisor talked to him six times. This was three days after his missed call in day. Why did the employer not discharge him on 5/28/07 or at 8 AM on 5/29/07? The Staff Hearing [O]fficer needs to ask this question. Claimant submits there is no good answer. The employer saw this as an opportunity to fire claimant for filing a Workers' Compensation claim.
 It just so happens that on 5/29/07, the Bureau of Workers' Compensation mailed out an Order granting temporary total compensation from 4/27/07 to 4/29/07.
 The Staff Hearing Officer needs to scrutinize the basis for this discharge. There are no other work violations cited as grounds for discharge. Certainly, the "timing" herein is as suspect as it was in [State ex rel. Roddy v. Indus. Comm., Franklin App. No. 04AP-930, 2006-Ohio-1185] and the Industrial Commission needs to address this issue.
 {¶ 41} 23. Following a November 1, 2007 hearing, a staff hearing officer ("SHO") issued an order stating:
 The order of the District Hearing Officer, from the hearing dated 08/22/2007, is modified to the following extent. The MedCo14, filed 06/01/2007, is denied.
 Staff Hearing Officer denies the request for temporary total disability compensation from 05/30/2007 to date. Staff Hearing Officer finds that, the claimant was discharged on 05/29/2007 for his failure to appear or call in, on 05/25/2007. Claimant acknowledged at hearing that, he did not show or call in on that date. The employer has a written work policy, in its handbook, noting that a no call/no show could result in termination. The claimant acknowledged receiving this handbook on 02/02/2007. Therefore, based on the case of Louisiana-Pacific, Staff Hearing Officer finds that, the claimant voluntarily abandoned his employment and was *Page 13 
terminated, as a result of his inaction, thereby rendering him ineligible for temporary total disability compensation benefits.
 The balance of the order of the District Hearing Officer is affirmed in its entirety and is incorporated herein, as if fully rewritten.
 {¶ 42} 24. On November 30, 2007, another SHO mailed an order refusing relator's administrative appeal from the SHO's order of November 1, 2007.
 {¶ 43} 25. On February 25, 2008, relator, Cornelius R. Love, filed this mandamus action.
Conclusions of Law: {¶ 44} It is the magistrate's decision that this court issue a writ of mandamus, as more fully explained below.
 {¶ 45} A voluntary departure from employment precludes receipt of TTD compensation. An involuntary departure does not. State ex rel. RockwellInternatl. v. Indus. Comm. (1988), 40 Ohio St.3d 44.
 {¶ 46} In State ex rel. Louisiana-Pacific Corp. v. Indus. Comm.
(1995), 72 Ohio St.3d 401, 403, the claimant was fired for violating the employer's policy prohibiting three consecutive unexcused absences. The court held that the claimant's discharge was voluntary, stating:
 * * * [W]e find it difficult to characterize as "involuntary" a termination generated by the claimant's violation of a written work rule or policy that (1) clearly defined the prohibited conduct, (2) had been previously identified by the employer as a dischargeable offense, and (3) was known or should have been known to the employee. Defining such an employment separation as voluntary comports with [State ex rel. Ashcraft v. Indus. Comm. (1987), 34 Ohio St.3d 42] and [State ex rel. Watts v. Schottenstein Stores Corp. (1993), *Page 14 68 Ohio St.3d 118] — i.e., that an employee must be presumed to intend the consequences of his or her voluntary acts.
 {¶ 47} In State ex rel. McKnabb v. Indus. Comm. (2001),92 Ohio St.3d 559, 561, the court held that the rule or policy supporting an employer's voluntary abandonment claim must be written. The court explained:
 Now at issue is Louisiana-Pacific's reference to a written rule or policy. Claimant considers a written policy to be an absolute prerequisite to precluding TTC. The commission disagrees, characterizing Louisiana-Pacific's language as merely illustrative of a TTC-preclusive firing. We favor claimant's position.
 The commission believes that there are common-sense infractions that need not be reduced to writing in order to foreclose TTC if violation triggers termination. This argument, however, contemplates only some of the considerations. Written rules do more than just define prohibited conduct. They set forth a standard of enforcement as well. Verbal rules can be selectively enforced. Written policies help prevent arbitrary sanctions and are particularly important when dealing with employment terminations that may block eligibility for certain benefits.
(Emphasis sic.)
 {¶ 48} In State ex rel. Walters v. Indus. Comm., Franklin App. No. 01AP-1043, 2002-Ohio-3236, some 17 months after Michael Walters sustained a crush injury to his foot in an industrial accident, his employer initiated an investigation into his employment application. The investigation revealed that Walters had failed to disclose several criminal convictions and incarcerations on his application. The employer then fired Walters for falsifying his application. The application form had informed Walters that giving false information would justify dismissal if discovered at a later time. *Page 15 
 {¶ 49} The commission found, pursuant to Louisiana-Pacific, that Walters' termination constituted a voluntary abandonment of employment. However, the commission failed to address Walters' defense that the discharge was a pretext aimed at avoiding employer liability for the industrial injury. Adopting its magistrate's decision, this court, inWalters, issued a writ of mandamus ordering the commission to issue a new order that addresses the pertinent issues.
 {¶ 50} Noting that a discharge motivated by the claimant's filing of a workers' compensation claim is not a voluntary abandonment of employment, the magistrate's decision adopted by this court states:
 * * * [W]hen the employer (or other party) raises the argument of voluntary abandonment of employment under Louisiana-Pacific and supports it with evidence, then the commission must address the elements of proof in Louisiana-Pacific, and must deny TTD if the loss of wages was caused by claimant's voluntary choice. * * * If the claimant argues and presents evidence, however, that his violation of the rule was a pretext for a discharge that was causally related to the industrial injury, then the commission must determine, regardless of proof that the employee knowingly violated a written work rule, whether the employer used the violation as a pretext for discharging him and would have continued to employ him but for the industrial injury and/or workers' compensation claim.
Id. at ¶ 38.
 {¶ 51} Later, in State ex rel. Todd v. Indus. Comm., Franklin App. No. 02AP-993, 2003-Ohio-2731, this court was presented with facts remarkably similar to those in Walters. In Todd, the commission found, pursuant toLouisiana-Pacific, that the claimant had voluntarily abandoned her employment. Unlike Walters, however, Todd did not argue that her discharge was pretextual before the commission. Thus, this court *Page 16 
did not find an abuse of discretion in the commission's failure to address whether the discharge was pretextual.
 {¶ 52} In State ex rel. Roddy v. Indus. Comm., Franklin App. No. 04AP-930, 2006-Ohio-1185, Richard A. Roddy injured his foot on May 23, 2002 and underwent surgery. He received TTD compensation from May 24, 2002 through August 7, 2002, when he returned to restricted duty work. He suffered continuing foot pain and eventually obtained an additional allowance for "plantar nerve lesion." Roddy was then scheduled for surgery on May 13, 2003 to remove the neuroma. Two weeks before the surgery, on April 22, 2003, he was fired for an incident in which he started a tow motor without first checking to see whether it was in gear, causing it to lurch forward and strike a machine and a fellow employee.
 {¶ 53} In Roddy, the commission, relying onLouisiana-Pacific, determined that Roddy had voluntarily abandoned his employment by violating the company's general safety-related rules. This court noted that Roddy had previously been warned on multiple occasions by the employer for safety-related violations.
 {¶ 54} Roddy sought a writ of mandamus from this court. Roddy argued that the commission abused its discretion by failing to address whether his firing was pretextual. This court held that the commission's failure to address pretext was not an abuse of discretion. This court explained:
 * * * Relator has argued in response only that he presented evidence before the commission establishing the chronology of his discharge and his pending TTD claim. While the timing is obviously suspicious, this evidence does not establish that pretext was argued before the commission, nor does anything else in the record so demonstrate. * * * *Page 17 
Id. at ¶ 8.
 {¶ 55} Here, relator argues that the commission abused its discretion by failing to address his argument, set forth in counsel's memorandum, that his firing was a pretext for his pursuit of workers' compensation. In the memorandum to the SHO, counsel cited Roddy to support relator's position that the "timing" of the discharge is suspect and, thus, pretext must be addressed.
 {¶ 56} Here, relator also argues that the failure to qualify the claim for the bureau's 15K program[1] motivated the employer to discharge him. There is evidence of record that the employer had elected to participate in the 15K program. As noted previously, Dr. Hernandez's C-9 was "dismissed without prejudice as the employer is part of the $5K Medical Only program." Moreover, counsel's May 15, 2007 letter to the bureau addresses the "5k program" with respect to TTD compensation. *Page 18 
 {¶ 57} Relator here also emphasizes that the employee handbook provides, in calling off work, that failing to notify your immediate supervisor "may result in disciplinary action up to and including termination." There is no explanation in the employer's records submitted to the commission as to why the severest penalty for the violation was chosen.
 {¶ 58} Here, the employer points out that relator was required to present more than an argument in order to raise a pertinent issue that the SHO is required to address in his order. According to the employer, relator failed to present evidence upon which the commission could rely to support relator's argument regarding pretext.
 {¶ 59} According to the employer, relator premises his pretext argument solely on the timing of the discharge. According to the employer, the timing of the discharge "does not raise the slightest inference that he was discharged in retaliation for seeking workers' compensation benefits." (Employer's brief, at 8.)
 {¶ 60} The employer argues that the length of time between the no-call, no-show violation on Friday, May 25, 2007, and the discharge on Tuesday, May 29, 2007, following Memorial Day, indicates that the discharge occurred the "next business day" after the date of the violation. (Employer's brief, at 8.) Relator characterizes the delay from violation to discharge as "brief," and therefore of no consequence. Id.
 {¶ 61} Relator also argues that there is no evidence of ill-will between relator and his employer. Employer also argues that there is no evidence that on the date of discharge, the employer even knew of the bureau's TTD award mailed on that date.
 {¶ 62} In the magistrate's view, the evidence of record is subject to interpretation that could result in either a finding for relator or a finding for the employer. It is clearly *Page 19 
not the duty of this court to resolve the disputed issue for the commission or to weigh the evidence in the record.
 {¶ 63} The commission, or its hearing officers, like any fact finder in any administrative, civil or criminal proceeding may draw reasonable inferences and rely upon his or her common sense in evaluating evidence.State ex rel. Supreme Bumpers, Inc. v. Indus. Comm., 98 Ohio St.3d 134,2002-Ohio-7089, at ¶ 69.
 {¶ 64} Clearly, the employer's "next business day" argument does not detract from the view that the evidence is subject to interpretation. The record does not disclose information regarding the employer's normal business days. Nor does the argument explain why relator's supervisor may have allowed relator to work on the holiday presumably knowing that relator had violated the no-call, no-show rule the previous Friday.
 {¶ 65} Obviously, the case for a finding of pretext is a circumstantial one requiring the fact finder to draw factual inferences favorable to relator's theory. Nevertheless, it is clear to this magistrate that relator did present evidence upon which the commission could premise a finding of pretext. Because relator presented this evidence in support of his argument or claim for a finding of pretext, the commission abused its discretion in failing to address the issue.Walters, supra.
 {¶ 66} Citing State ex rel. Ohio Treatment Alliance v. Paasewe,99 Ohio St.3d 18, 2003-Ohio-2449, the employer claims here that it was relator who retaliated by immediately requesting TTD compensation following the discharge. According to the employer, Paasewe compels this court to conclude that the commission did not abuse it discretion in denying TTD compensation. *Page 20 
 {¶ 67} The employer confuses or mixes two separate issues before the commission. If the commission were to find a pretext on remand from this court, it would be required to enter a finding that relator did not voluntarily abandon his employment. Next, the commission would be required to weigh the persuasiveness of relator's medical evidence supporting the request for TTD compensation starting the day after his discharge. At best, Paasewe may present law pertinent to the merits of relator's request for TTD compensation. Clearly, Paasewe is not relevant to the determination of an alleged employer pretext. It is important to remember, however, that relator was supposedly restricted to light-duty work on the date of his discharge. In the absence of the availability of light-duty work, relator claimed TTD compensation.
 {¶ 68} Accordingly, for all the above reasons, it is the magistrate's decision that this court issue a writ of mandamus ordering the commission to vacate its SHO's order of November 1, 2007 and, in a manner consistent with this magistrate's decision, enter a determination of whether the discharge was a pretext, and if a pretext be found, adjudicate the merits of relator's request for TTD compensation.
[1] Parenthetically, the magistrate notes that information regarding the bureau's 15K program can be obtained at the bureau's Internet website at www.ohiobwc.com. The bureau's website states:
 How the $15,000 Medical-Only Program (15K Program) works
 When an employer chooses to participate in the 15K Program, the employer becomes the manager of the claim. The company's managed care organization (MCO) can not authorize treatment or pay medical bills. The employer can register for the program by calling 1-800-OHIOBWC and listening to the options. Once an employer enrolls in the 15K Program, the employer is responsible for the bills in all medical-only claims (claims with seven or fewer lost days from work) with injury dates after the enrollment effective date unless:
 * * *
 Lost-time claims
 If the injured worker loses more than seven days of work, the injury is no longer eligible for this program and a claim must be filed with BWC. If a claim has already been filed with BWC, the process to change the claim to lost time will automatically remove the claim from the 15K Program. The MCO will be responsible for processing subsequent medical bills.
 * * * *Page 1